MANNING CURTIS BRADSHAW
   & BEDNAR LLC
Sammi V. Anderson, USB #9543
sanderson@mc2b.com
James E. Ji, USB #12352
jji@mc2b.com
136 East South Temple, Suite 1300
Salt Lake City, UT 84111
Telephone (801) 363-5678
Facsimile (801) 364-5678

*Attorneys for Plaintiff Nationwide Car Sales, Ltd.*

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| NATIONWIDE CAR SALES, LTD., <br><br>                Plaintiff, <br><br> vs. <br><br> LEWIS TRANSPORTATION GROUP, LLC, LEWIS VENTURES, LLC, LEWIS MANAGEMENT, INC., GARY LEWIS, PATRICK LEWIS, and DOLLAR THRIFTY AUTOMOTIVE GROUP, INC., <br><br>                Defendants. | **VERIFIED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** <br><br> Civil No. 2:14-cv-00878-TC <br><br> Judge Tena Campbell |

Plaintiff Nationwide Car Sales, Ltd. ("Plaintiff"), by and through its undersigned counsel, files this Complaint against Defendants Lewis Transportation Group, LLC, Lewis Ventures, LLC, Lewis Management, Inc., Gary Lewis, Patrick Lewis, and Dollar Thrifty Automotive Group, Inc. (collectively "Defendants"), and states, alleges and avers as follows:

## PARTIES

1.      Plaintiff is a limited partnership formed under the laws of the State of Pennsylvania, and has a principal office in Nanticoke, Pennsylvania.  The sole partner of Plaintiff is Hud Contractors, Inc., which is a corporation formed under the laws of the State of Pennsylvania, and has a principal office in Nanticoke, Pennsylvania.

2.      Defendant Lewis Transportation Group, LLC ("LTG") is a limited liability company formed under the laws of the State of Indiana, and has a principal office in Salt Lake City, Utah.  LTG conducts business in several states, including Utah.  As discussed below, LTG does business in Utah under the name "Thrifty Car Rental."  As described below, Defendant Patrick Lewis holds himself out to the public as the General Manager of Thrifty Car Rental. Defendant Gary Lewis holds himself out to the public as the owner of LTG.

3.      Defendant Lewis Ventures, LLC ("Lewis Ventures") is a limited liability company formed under the laws of the State of Utah, and has a principal office in South Jordan, Utah.  Lewis Ventures does business in Utah under the name "Thrifty Car Sales/WVC."

4.      Defendant Lewis Management, Inc. ("Lewis Management") is a corporation formed under the laws of the State of Utah, and has a principal office in South Jordan, Utah.

5.      Upon information and belief, Defendant Gary Lewis is an individual currently residing in the State of Florida.  During the time period of the events discussed below, Defendant Gary Lewis was a resident of, and conducted business in, the State of Utah.  Defendant Gary Lewis is the owner and principal of LTG, is a manager of Lewis Ventures, and is the President and Director of Lewis Management.

6.      Upon information and belief, Defendant Patrick Lewis is an individual currently residing in the State of Florida or the State of Utah.  During the time period of the events described below, Defendant Patrick Lewis was a resident of, and conducted business in, the State of Utah.  Defendant Patrick Lewis is the son of Defendant Gary Lewis.  Defendant Patrick Lewis is a manager of LTG, and the Vice President of Lewis Management.  Further, Defendant Patrick Lewis holds himself out to the public as the "General Manager" of Thrifty Car Rental.

7.      In this Complaint, Defendants LTG, Lewis Ventures and Lewis Management are collectively referred to as "Corporate Lewis Defendants"; and Defendants Gary Lewis and Patrick Lewis are collectively referred to as "Individual Lewis Defendants."  These Defendants are collectively referred to as "Lewis Defendants."

8.      Defendant Dollar Thrifty Automotive Group, Inc. ("Dollar Thrifty") is a corporation formed under the laws of the State of Delaware, and has a principal office in Tulsa, Oklahoma.  Dollar Thrifty conducts business in the State of Utah.

## JURISDICTION AND VENUE

9.      Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332, as this is a civil action between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.  Alternatively, subject matter jurisdiction is also proper pursuant to 18 U.S.C. § 1964 and 28 U.S.C. § 1331, as this Court has federal question jurisdiction of Plaintiff's claim under 18 U.S.C. § 1961 *et seq.*, Racketeer Influenced and Corrupt Organizations Act ("RICO"), and has supplemental jurisdiction of Plaintiff's pendent state law claims pursuant to 28 U.S.C. § 1367, as they form part of the same case or controversy.

10.      The Court has personal jurisdiction over all Defendants.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## FACTS

12.     During the time period of the events described below, the Lewis Defendants operated a car rental / sales business in Utah.  The Lewis Defendants operated their business under the well-known Thrifty brand name.  This business, called Thrifty Car Rental, had a primary location at 15 S. 2400 W. in Salt Lake City, Utah, as well as other locations at 150 W. 500 S. in Salt Lake City, Utah, and at 5650 S. State Street in Murray, Utah.

13.     Upon information and belief, Defendants Lewis Ventures and Lewis Management are, or were, involved in the operations of Thrifty Car Rental.  Lewis Ventures' registered office is 15 S. 2400 W. in Salt Lake City, Utah, which is the same address where Thrifty Car Rental operates.  Further, Lewis Ventures operates in Utah under the d/b/a "Thrifty Car Sales/WVC." Defendant Gary Lewis is the Director and President of Defendant Lewis Management, and Defendant Patrick Lewis is the Vice President.  Further, Lewis Management also shares the same office with Lewis Ventures at 11278 Autumn Farm Drive in South Jordan, Utah.

14.     In connection with the unlawful and fraudulent operations of Thrifty Car Rental, described below, the Individual Lewis Defendants have exercised dominion and control over the Corporate Lewis Defendants, such that these companies are their alter ego, a sham, facade, and mere instrumentality for their personal benefit.  The Individual Lewis Defendants have disregarded and abused the corporate form and structure of the companies.  Further, the Individual Lewis Defendants have purposefully used the corporate form of the Corporate Lewis Defendants to commit an intentional fraud upon Plaintiff and other victims, and to defeat the

ends of justice and otherwise evade the law, including with respect to the fraudulent and unlawful operations of Thrifty Car Rental.

15.     Defendant LTG has been administratively dissolved and, under applicable Indiana statutory law, LTG may only conduct business necessary to wind up and liquidate its business and affairs.  According to the records of the State of Utah, Defendant Lewis Management's status as of September 11, 2014 is "delinquent" for failure to file a renewal.  Similarly, according to the records of the State of Utah, Defendant Lewis Venture's status as of September 11, 2014 is "delinquent" for failure to file a renewal.  Further, upon information and belief, Defendant Gary Lewis has recently left Utah and relocated to Florida.

16.     Accordingly, the Corporate Lewis Defendants are mere alter egos of the Individual Lewis Defendants, and the Corporate Lewis Defendants are also mere alter egos of each other.  As such, each of the Lewis Defendants is jointly and severally liable for the unlawful and fraudulent acts perpetrated by the others, and the Lewis Defendants cannot use the corporate form to defeat the ends of justice and otherwise evade the law.

17.     Upon information and belief, the Lewis Defendants operated Thrifty Car Rental under a franchise agreement with Defendant Dollar Thrifty, which owns and operates the Thrifty brand (and Dollar brand).

18.     Plaintiff owns and operates used car dealerships in Pennsylvania.  From 2011 to the present, Plaintiff sold approximately 1,895 cars.

19.     Plaintiff's business model is to purchase its used car inventory from rental car companies such as Thrifty, Enterprise, Budget, and Avis.  Rental car companies typically purchase new cars for their rental fleets, and then sell those cars to used car dealers or directly to

consumers after only several months of rental use.  The primary source of Plaintiff's inventory

comes from these relatively-new cars sold by rental car companies.  Plaintiff operates under this

business model in large part because of the credibility and established reputations that these

reputable, well-known rental car companies provide.  Plaintiff knows the company it is dealing

with, its reputation, and who Plaintiff can turn to in the event there is a problem with an

inventory purchase.  This gives Plaintiff substantial comfort and peace-of-mind when making

inventory purchases, which (as in this case) can cost hundreds of thousands of dollars.

20.     In or around late July or early August 2013, Plaintiff's sales manager was

contacted via telephone and email by a used car sales broker with whom Plaintiff had previously

done business.  The broker inquired as to whether Plaintiff was interested in purchasing some

used cars from a Thrifty in Utah.

21.     The broker emailed Plaintiff's sales manager a list showing the make/model, year

and vehicle identification (VIN) number of the cars available for sale.

22.     Upon information and belief, the broker was compensated by the Lewis

Defendants on a commission basis, which is a customary form of compensation for brokers in

this industry.  During the entire time period of the events discussed below, the broker's and the

Lewis Defendants' conduct, words and actions indicated that the broker was acting as the Lewis

Defendants' agent.  The Lewis Defendants never suggested to Plaintiff that the broker was not

acting as their agent for this transaction, and the Lewis Defendants never took any action to

repudiate the agency or apparent agency relationship created between them and the broker.

23.     Plaintiff's sales manager and the broker had multiple communications concerning

the solicitation and sale of the cars from the Lewis Defendants' Thrifty Car Rental.  These

telephone and email communications took place in around late July to middle August 2013, and were conducted via interstate telephone wires.  Upon information and belief, during the time period of this transaction, the broker was operating out of Arizona.

24.     Based upon the representations of the broker, who was acting as the Lewis Defendants' agent or apparent agent, and the reputation and recognition of the Thrifty brand name, Plaintiff decided to purchase a total of 25 cars from Thrifty Car Rental.

25.     The 25 cars were sold to Plaintiff in three separate loads.  The first load was comprised of eight cars, which Plaintiff agreed to purchase for $168,200.  The second load was also comprised of eight cars, which Plaintiff agreed to purchase for $168,000.  The third load was comprised of nine cars, which Plaintiff agreed to purchase for $151,900.

26.     The Lewis Defendants emailed Plaintiff a "Bill of Sale Agreement," dated August 14, 2013, for Plaintiff's purchase of the first load of eight cars.  A copy of this agreement is attached hereto as Exhibit A.  The agreement identifies the eight cars purchased by Plaintiff, and also includes wire transfer instructions for Defendant LTG's bank account.  Defendant Patrick Lewis electronically signed the agreement on behalf of LTG, and Plaintiff's manager electronically signed on behalf of Plaintiff.

27.     On August 15, 2013, as is customary for these types of transactions in this industry, Plaintiff transferred $168,200 in funds to the Lewis Defendants via interstate wire transfer in exchange and as payment for the first load of cars.  The Lewis Defendants were supposed to use the funds transmitted by wire to clear the liens associated with the car titles and then transfer the same to Plaintiff.  The wire transfer was initiated through Plaintiff's bank (Pennstar Bank, located in Norwich, New York) and was identified with wire sequence number

7

12958.  The funds were transferred to LTG's bank account at Yellowstone Bank, located in Laurel, Montana.  A detail of this wire transfer is attached hereto as Exhibit B.

28.     The Lewis Defendants emailed Plaintiff a "Bill of Sale Agreement," dated August 16, 2013, for Plaintiff's purchase of the second load of eight cars.  A copy of this agreement is attached hereto as Exhibit C.  The agreement identifies the eight cars purchased by Plaintiff, and also includes wire transfer instructions for Defendant LTG's bank account.  Defendant Patrick Lewis electronically signed the agreement on behalf of LTG, and Plaintiff's manager electronically signed on behalf of Plaintiff.

29.     On August 16, 2013, as is customary for these types of transactions in this industry, Plaintiff transferred $168,000 in funds to the Lewis Defendants via interstate wire transfer in exchange and as payment for the second load of cars.  The Lewis Defendants were supposed to use the funds transmitted by wire to clear the liens associated with the car titles and then transfer the same to Plaintiff.  The wire transfer was completed through Plaintiff's bank (Pennstar Bank, located in Norwich, New York) and was identified with wire sequence number 12991.  The funds were transferred to LTG's bank account at Yellowstone Bank, located in Laurel, Montana.  A receipt of this wire transfer is attached hereto as Exhibit D.

30.     The Lewis Defendants emailed Plaintiff a "Bill of Sale Agreement," dated August 21, 2013, for Plaintiff's purchase of the third load of nine cars.  A copy of this agreement is attached hereto as Exhibit E.  The agreement identifies the nine cars purchased by Plaintiff, and also includes wire transfer instructions for Defendant LTG's bank account.  Defendant Patrick Lewis electronically signed the agreement on behalf of LTG, and Plaintiff's manager electronically signed on behalf of Plaintiff.

8

31.     On August 21, 2013, as is customary for these types of transactions in this industry, Plaintiff transferred $151,900 in funds to the Lewis Defendants via interstate wire transfer in exchange and as payment for the third load of cars.  The Lewis Defendants were supposed to use the funds transmitted by wire to clear the liens associated with the car titles and then transfer the same to Plaintiff.  The wire transfer was completed through Plaintiff's bank (Pennstar Bank, located in Norwich, New York) and was identified with wire sequence number 13037.  The funds were transferred to LTG's bank account at Yellowstone Bank, located in Laurel, Montana.  A receipt of this wire transfer is attached as Exhibit F.

32.     Plaintiff is experienced in the used car sales industry.  The above three transactions with the Lewis Defendants were generally consistent with Plaintiff's prior experience in purchasing used cars from rental car companies, and also consistent with the usual and regular customs and practices in the industry.

33.     In around mid-September 2013, the 25 cars were delivered to Plaintiff from Utah to Pennsylvania by a transportation company owned and operated by the Lewis Defendants.  Upon delivery, the Lewis Defendants' transportation company's drivers demanded cash-on-delivery (COD) payment from Plaintiff for the transportation costs.  Plaintiff paid these delivery costs, which totaled $14,700 (or $4,900 per truck load), because it was demanded by the Lewis Defendants before they would release the cars.  Upon information and belief, the Lewis Defendants demanded COD payment for the delivery, rather than billing it in connection with the overall transaction, because the Lewis Defendants never intended to perform their obligation to deliver unencumbered titles to the purchased vehicles.

34.     Based upon Plaintiff's experience with purchasing used cars from rental car companies, upon receiving payment from Plaintiff, it customarily takes the seller about 10 to 21 days to deliver the car titles.  This short lag period is required so that the seller can use the funds received from Plaintiff to pay off the remaining balances with the lender.  Once the lender receives the balance due, it will release the title to the seller, who will then transfer the clear title to Plaintiff.  Without the title, a car is useless to Plaintiff because it cannot be sold to customers.

35.     Contrary to, and in breach of the parties' agreements, the Lewis Defendants never delivered any of the 25 car titles to Plaintiff.  Further, the Lewis Defendants did not use the $488,100 in total funds they received from Plaintiff to pay off the lenders, nor did they provide Plaintiff with unencumbered ownership to any of the 25 cars.  Rather, the Lewis Defendants simply pocketed and stole these funds from Plaintiff for their own personal use and benefit.

36.     Upon information and belief, the Lewis Defendants never intended to pay off and deliver any of the 25 car titles.  Rather, from the outset, the Lewis Defendants' scheme was to fraudulently induce Plaintiff to wire the $488,100 in funds; use the funds for their own personal use and benefit; and then provide Plaintiff with false representations for their failure to deliver the titles, in order to prevent or delay Plaintiff from taking legal action against them or reporting them to law enforcement.

37.     Upon information and belief, the Lewis Defendants have perpetrated their fraudulent schemes on other victims as well.  Plaintiff has since learned that the Federal Bureau of Investigation (FBI) is currently investigating one or more of the Lewis Defendants for possible violations of federal criminal laws.  On July 16, 2014, Plaintiff received a notice from

the FBI of its investigation into the Lewis Defendants, a copy of which is attached hereto as

Exhibit G.

38.     Plaintiff has also learned that the FBI has interviewed Defendant Gary Lewis as

part of its investigation.  Upon information and belief, at that interview, Defendant Gary Lewis

admitted that the Lewis Defendants illegally used the funds received from Plaintiff for their own

personal use and benefit, rather than paying off the balances with the lenders to obtain the car

titles and transfer them to Plaintiff, as the Lewis Defendants promised to Plaintiff.  Upon

information and belief, Defendant Gary Lewis also acknowledged to the FBI that the Lewis

Defendants were obligated to deliver clear titles to Plaintiff, and he claimed to the FBI that he

needed more time to pay off those lenders.

39.     In or around late September 2013, after failing to receive any of the 25 car titles

within a reasonable time period, Plaintiff's sales manager attempted to contact the Lewis

Defendants via telephone and text message to inquire as to the status of the titles.

40.     Plaintiff's sales manager tried to reach Defendant Patrick Lewis by telephone and

text message.  Defendant Patrick Lewis initially ignored these messages.  When Defendant

Patrick Lewis responded, he told Plaintiff's sales manager that the delay in providing the titles

was because his father (Defendant Gary Lewis) was sick and had suffered a heart attack.  Upon

information and belief, this was a false statement made by Defendant Patrick Lewis to placate

Plaintiff and to postpone legal action or their report to the authorities.

41.     The Lewis Defendants repeatedly assured Plaintiff's sales manager that the titles

would be arriving shortly.  These were false representations by the Lewis Defendants.  The

11

Lewis Defendants had, in fact, made no progress in paying off the titles with the lenders, and they had no intention of doing so.

42.     Plaintiff's sales manager also called the broker who acted as the Lewis Defendants' agent or apparent agent for this transaction.  The broker responded that he too was unable to reach the Lewis Defendants.

43.     When, contrary to the Lewis Defendants' representations and assurances to Plaintiff, the car titles did not arrive, Plaintiff's general manager stepped in to try and resolve the situation.  Plaintiff's general manager called the Lewis Defendants virtually every day; however, they did not answer his calls.  Plaintiff's general manager left repeated voicemail messages; however, the Lewis Defendants mostly ignored these messages.  On the occasions when the Lewis Defendants responded, they gave Plaintiff's general manager more assurances that the car titles would be arriving shortly.  These representations to Plaintiff's general manager were knowingly false when made, and were made in furtherance of the Lewis Defendants' fraudulent scheme against Plaintiff.

44.     After Plaintiff's general manager was unable to obtain the car titles from the Lewis Defendants, Plaintiff's president, Joe Prociak, stepped in to try and resolve the situation.  On October 11, 2013, Mr. Prociak sent Defendant Gary Lewis a text message stating that Plaintiff needed to receive the car titles immediately.

45.     Four days later, on October 15, 2013, after receiving only more false promises from the Lewis Defendants that the car titles would be coming shortly, Mr. Prociak had the following text message exchange with Defendant Gary Lewis:

[Mr. Prociak:]
Hi Mr. Lewis.
It's Joe Prociak.
Just looking for an update on the titles.  Could you give me a call
when you're free?  Thanks.

[Defendant Gary Lewis:]
Yes I will

[Mr. Prociak:]
Mr. Lewis, I'm still waiting for your call.

[Mr. Prociak:]
Mr. Lewis.
You promised to call.  You did not.  I tried to call.  Your voicemail
was full.  If I don't hear from you tonight, I will have no other
choice than to take all civil and criminal remedies to resolve this
important issue.

[Defendant Gary Lewis:]
Very sorry I came home with a lot of pain from surgery.  Have not
answered phone calls all afternoon.  I will followup with you in the
morning and give you another contact in case you can not get
ahold of me.  As I said I will correct this issue, please allow me to
call you first thing in the morning.
Thanks.

46.     Upon information and belief, Defendant Gary Lewis knowingly and falsely

misrepresented that he would "correct this issue," and the Lewis Defendants had no intention of

delivering any of the car titles.  The Lewis Defendants were simply trying to prevent or delay

Plaintiff from taking legal action against them or reporting them to the authorities.

47.     On October 21, 2013,  Mr. Prociak exchanged the following text communications

with Defendant Gary Lewis:

[Mr. Prociak:]
Mr. Lewis.
I still haven't received any titles.  Could you give me a call?

13

[Defendant Gary Lewis:]
Yes I will, just got out of a meeting, will call when I get to my office
Thanks

[Mr. Prociak:]
Thank you.

[Defendant Gary Lewis:]
You will not believe this bit I got into a car accident on the way to the office.  Will call after done with police

48.    On October 22, 2013, Defendant Gary Lewis sent the following text to Mr.

Prociak:

[Defendant Gary Lewis:]
Please give me until tomorrow to give the the final resolutions on the titles in question.

49.    On October 23, 2013, Mr. Prociak and Defendant Gary Lewis exchanged the

following text communications:

[Mr. Prociak:]
Mr. Lewis.
Can you give me the status on the titles?  Have the liens been satisfied?

[Mr. Prociak:]
Mr. Lewis.
I understand that none of the liens for the subject vehicles have been satisfied.  Unfortunately it appears that we will have to resort to criminal and/or civil action if this matter is not resolved  today.

[Defendant Gary Lewis:]
Obviously I need some time ti resolve this matter.  Please allow me to work this out with you.  I just need some time obviously and will cam work this out over time.

Upon information and belief, the above representations by Defendant Gary Lewis were knowingly false when made, and the Lewis Defendants had no intention to provide Plaintiff with any of the titles to the 25 cars that Plaintiff purchased from them.

50.     Over the next several weeks, the Lewis Defendants continued to provide Plaintiff with excuses for failing to deliver the car titles as they had promised, and more knowingly false promises that the titles would be arriving shortly.  These misrepresentations were all made in furtherance of the Lewis Defendants' fraudulent scheme against Plaintiff.

51.     On January 24, 2014, Defendant Gary Lewis sent the following text message to Mr. Prociak:

> [Defendant Gary Lewis:]
> I received a voice mail from you.  Sorry about all this and I will fix it.  Please give me a little more time I will have titles coming to you over the couple if weeks.  I realize you have been told  that before but it will happen.  If we can talk on Monday that would be great, just send me a time that is good for you and I will call you.

52.     On January 30, 2014, Defendant Gary Lewis, candidly acknowledging his repeated lies and deceptions to Plaintiff, sent the following text message to Mr. Prociak:

> [Defendant Gary Lewis:]
> You probably do not believe a thing I tell you but I have some personal issues to take care of and will not be able to call you until Friday or possibly Saturday morning,
> Gary

Despite his above claim that he would call Mr. Prociak by the following Friday or Saturday, Defendant Gary Lewis never called Mr. Prociak as he claimed he would.

53.     In addition to using text and telephone communications, during this same time period, the Lewis Defendants were also using email communications to further their fraudulent

scheme against Plaintiff.  On November 20, 2013, Defendant Gary Lewis sent the following

email to Mr. Prociak:

> Mr. Prociak,
> Sorry I have not called you.  Seems that I am always going in too
> many directions at one time.  I have a long conference call that I
> am on with our corporate office.  I will guarantee that you will
> have all titles by 12/2 at the latest due to Thanksgiving Holidays.
> As I said before some are currently in process.  Please allow me to
> get these to you as stated in the Email.
> Gary.

Contrary to Defendant Gary Lewis's above "guarantee," Defendants did not provide any of the

25 car titles to Plaintiff by 12/2 or at any time thereafter.  Similarly, contrary to the above

representation that "some [car titles] are currently in process," the Lewis Defendants had in fact

made no progress in getting any of the car titles from their lenders.  Upon information and belief,

Defendant Gary Lewis's reference in this email to "our corporate office" is a reference to

Defendant Dollar Thrifty.

54.     Plaintiff has attempted to mitigate its losses by working with the lenders to pay

off and obtain at least some of the 25 car titles.  To date, using its own funds, Plaintiff has paid

off the balances for 21 of the cars, and Plaintiff has obtained the titles to those cars.

Nevertheless, even assuming that Plaintiff is able to sell these cars, Plaintiff will still incur a

substantial loss as a result of the Lewis Defendants' unlawful and fraudulent conduct.

55.     The Lewis Defendants purposefully used the well-known and well-recognized

Thrifty brand name to further their unlawful conduct and fraudulent scheme.

56.     Upon information and belief, the Lewis Defendants operated their Thrifty Car

Rental business under a franchise agreement with Defendant Dollar Thrifty.

57.     Upon information and belief, the Lewis Defendants used the Thrifty brand name with the permission and encouragement of Defendant Dollar Thrifty.  Upon information and belief, Defendant Dollar Thrifty permits and encourages franchisees such as the Lewis Defendants to use Thrifty marketing and electronic media materials, such as Thrifty website designs, emails, signage, etc.  For example:

a)      Defendant Gary Lewis used a Thrifty email address, Glewis@thriftyslc.com.

b)      In connection with their Thrifty Car Rental business, the Lewis Defendants operate a website at www.thriftyslc.com.  The website prominently displays the Thrifty logo on every page. Upon information and belief, this same version of the website has been used by the Lewis Defendants for the last several years.

c)      A section of this website is devoted to Thrifty Car Rental's "auto sales" operations, the same operations through which Plaintiff purchased the cars from Thrifty Car Rental, which sales operations are done under the Thrifty brand name. This section expressly indicates that customers can purchase the cars that are part of Thrifty Car Rental's rental fleet.

d)      Another section of this website refers customers to Defendant Dollar Thrifty's website, www.thrifty.com, and it also encourages customers to make a reservation on Defendant Dollar Thrifty's website.

e)      The "Bill of Sale Agreements" that the Lewis Defendants sent to Plaintiff had "Thrifty Car Rental" identified on them in multiple places.

f)      As discussed above, the Lewis Defendants and their broker represented to Plaintiff that the cars were being sold by a Thrifty car rental location in Utah.

17

58.     Further, Defendant Dollar Thrifty's webpage about Thrifty car rental franchise opportunities provides testimonials about the "benefits of owning a globally recognized brand" and about Thrifty's "contribution to franchisees' success."  (*See* http://www.thrifty.com/franchiseopportunities/content/carrental/testimonials.aspx.)  With respect to Thrifty car sale franchise opportunities, Defendant Dollar Thrifty represents that it provides support to its franchisees, including "operational support, training, marketing and advertising." (*See* http://www.thrifty.com/FranchiseOpportunities/content/CarSales.aspx.)

59.     Each of the 25 cars that the Lewis Defendants sold to Plaintiff came from Thrifty Car Rental's fleet of rental cars.

60.     Initially, Plaintiff believed that it was purchasing the 25 cars from Thrifty itself, and not from a franchisee of Thrifty.  It was not until after Plaintiff purchased the 25 cars from Thrifty Car Rental, while Plaintiff was trying to obtain the titles, that Plaintiff first learned that it had actually purchased the cars from a Thrifty franchisee and not from Thrifty itself.

61.     Upon information and belief, Defendant Dollar Thrifty exercised control over the manner in which the Lewis Defendants operated their Thrifty franchise, which may include, but is not limited to, requiring that the franchise be operated in conformity with a Thrifty operating manual, requiring that the franchise abide by standardized requirements for the portrayal of the Thrifty logo, colors, graphics, signage, and all other media, requiring that the Lewis Defendants consult with Thrifty before selecting the location of any new customer outlet, exercising control over which individuals may participate in the management of the franchise, exercising control over the hours of operation for the franchise locations, requiring that the franchise submit regular reports to Thrifty, exercising control over the number of vehicles in the franchise's fleet,

requiring that the franchise use Thrifty rental form agreements, reserving the right to inspect the franchise's premises and all parts of its business at any time during business hours, requiring the franchise to service vehicles from other Thrifty franchises, requiring the franchise to permit and facilitate Thrifty's inspection of the franchise's computer systems, exercising control over the amount that the franchise must spend on advertising, and requiring that the franchise display Thrifty signs and advertisements on its premises at times and places controlled by Thrifty.

62.     During the time period that Plaintiff's general manager was attempting to obtain the titles to the 25 cars, he called Defendant Dollar Thrifty to determine what was going on and why Plaintiff was unable to obtain the titles.  On multiple occasions, Plaintiff's general manager spoke with a Dollar Thrifty representative, which representative informed Plaintiff's general manager that the company had seen a pattern of complaints against, and problems with, the Lewis Defendants' Thrifty franchise.  Upon information and belief, Defendant Dollar Thrifty was previously aware of the Lewis Defendants' unsound and shady business practices.  In later calls, however, Dollar Thrifty's representatives were suddenly unwilling to speak with Plaintiff's general manager.  Upon information and belief, Defendant Dollar Thrifty instructed its representatives to stop speaking with Plaintiff because it fears liability for the unlawful acts of its franchisee, as Defendant Dollar Thrifty was previously aware of those acts, it directly and indirectly benefited from those acts, and it exercised control and direction over the franchisee.

63.     Upon information and belief, in around the summer of 2014, Defendant Dollar Thrifty agreed to purchase back the Thrifty franchise from the Lewis Defendants.  Upon information and belief, Defendant Dollar Thrifty took back this franchise from the Lewis

Defendants because it was aware of, and concerned with, the Lewis Defendants' unsound, shady and fraudulent business practices.

64.     Any proceeds that Defendant Dollar Thrifty owes the Lewis Defendants under this contract should be immediately subject to attachment and/or impleaded to the Court so that Plaintiff can be made whole from the losses sustained as a direct result of the Lewis Defendants' unlawful and fraudulent conduct.

65.     Upon information and belief, the Lewis Defendants have since used some or all of the proceeds from their fraudulent scheme against Plaintiff and others to open yet another car rental business in Salt Lake City, Utah – Ace Rent-a-Car.  Upon information and belief, this new business operates with the same phone number previously used by the Lewis Defendants in connection with Thrifty Car Rental.  Defendant Patrick Lewis holds himself out to the public as a Branch Manager for Ace Rent-a-Car, which is merely an instrument of the Lewis Defendants' ongoing fraudulent scheme.

### FIRST CLAIM FOR RELIEF
(Breaches of Contracts)
Against the Lewis Defendants

66.     Plaintiff re-alleges and incorporates herein by reference each of the proceeding allegations as if set forth completely herein.

67.     As described above, Plaintiff and the Lewis Defendants made three separate contracts.  Under the first contract, in exchange for the $168,200 in funds wired by Plaintiff on August 15, 2014, the Lewis Defendants agreed to transfer unencumbered ownership and clear titles to the eight cars comprising the first load.  Under the second contract, in exchange for the $168,000 in funds wired by Plaintiff on August 16, 2014, the Lewis Defendants agreed to

transfer unencumbered ownership and clear titles to the eight cars comprising the second load. Under the third contract, in exchange for the $151,900 in funds wired by Plaintiff on August 21, 2014, the Lewis Defendants agreed to transfer unencumbered ownership and clear titles to the nine cars comprising the third load.

68.     For each of these three contracts, the Lewis Defendants knew and understood that the cars would have no value to Plaintiff unless accompanied by proof of ownership in the form of clear title, allowing for full and free transfer of the cars to Plaintiff's customers.

69.     By wiring the $168,200 in funds to the Lewis Defendants, which they accepted, Plaintiff completed all of its obligations under the first contract.  By wiring the $168,000 in funds to the Lewis Defendants, which they accepted, Plaintiff completed all of its obligations under the second contract.  By wiring the $151,900 in funds to the Lewis Defendants, which they accepted, Plaintiff completed all of its obligations under the third contract.

70.     In breach of their obligations under each of these three contracts, the Lewis Defendants failed to deliver any of the 25 car titles to Plaintiff, and also failed to transfer unencumbered ownership of the cars to Plaintiff.

71.     In their subsequent communications with Plaintiff, the Lewis Defendants confirmed these contracts were made by the parties, and the Lewis Defendants admitted that they had failed to meet their obligations under the contracts.

72.     As a result of the Lewis Defendants' breaches of contracts, Plaintiff has suffered damages in an amount to be determined at trial, but not less than $500,000, plus interest and the costs and fees associated with collecting this amount.

73.     The Lewis Defendants, in their individual capacities and, as discussed above, as alter egos of each other, are jointly and severally liable to Plaintiff for all damages suffered by Plaintiff under this claim.

**SECOND CLAIM FOR RELIEF**
**(Breaches of Warranties)**
**Against the Lewis Defendants**

74.     Plaintiff re-alleges and incorporates herein by reference each of the proceeding allegations as if set forth completely herein.

75.     Each of Plaintiff's above three contracts with the Lewis Defendants qualifies as a contract for the sale of goods under, and is therefore governed by, the Utah Uniform Commercial Code – Sales, Utah Code Ann. § 70A-2-101 *et seq*.

76.     Section 70A-2-313 of the Utah Uniform Commercial Code – Sales states:

(1) … there is in a contract for sale a warranty by the seller that

(a) the title conveyed shall be good, and its transfer rightful…

(3) Unless otherwise agreed a seller who is a merchant regularly dealing in goods of the kind warrants that the goods shall be delivered free of the rightful claim of any third person by way of infringement or the like….

77.     The Lewis Defendants qualify as a "merchant" under Utah Code Ann. § 70A-2-104(1) with respect to their sales of used cars.

78.     Upon information and belief, the Lewis Defendants regularly deal in the sale of used cars, and in particular those used cars sold from their Thrifty Car Rental rental fleet.

79.     By failing to deliver unencumbered ownership and clear titles to any of the 25 cars purchased by Plaintiff, the Lewis Defendants have breached the statutory warranties found in each of their three contracts with Plaintiff.

80.     As a result of the Lewis Defendants' breaches of warranties, Plaintiff has suffered damages in an amount to be determined at trial, but not less than $500,000, plus interest and the costs and fees associated with collecting this amount.

81.     The Lewis Defendants, in their individual capacities and, as discussed above, as alter egos of each other, are jointly and severally liable to Plaintiff for all damages suffered by Plaintiff under this claim.

**THIRD CLAIM FOR RELIEF**
**(Breaches of Covenant of Good Faith and Fair Dealing)**
**Against the Lewis Defendants**

82.     Plaintiff re-alleges and incorporates herein by reference each of the proceeding allegations as if set forth completely herein.

83.     A covenant of good faith and fair dealing is implied in every contract.

84.     The Lewis Defendants have violated, and continue to violate, the covenant of good faith and fair dealing implied in their contracts with Plaintiff, by depriving Plaintiff of the benefits of its bargains with the Lewis Defendants.

85.     As a result of the Lewis Defendants' breaches of the covenant of good faith and fair dealing, Plaintiff has suffered damages in an amount to be determined at trial, but not less than $500,000, plus interest and the costs and fees associated with collecting this amount.

86.     The Lewis Defendants, in their individual capacities and, as discussed above, as alter egos of each other, are jointly and severally liable to Plaintiff for all damages suffered by Plaintiff under this claim.

## FOURTH CLAIM FOR RELIEF
### (Unjust Enrichment)
### Against the Lewis Defendants

87.     Plaintiff re-alleges and incorporates herein by reference each of the preceding allegations as if set forth completely herein.

88.     By wiring $488,100 in funds to the Lewis Defendants, Plaintiff conferred a valuable benefit on the Lewis Defendants.

89.     The Lewis Defendants acknowledged and appreciated the valuable benefit conferred upon them by Plaintiff.  This acknowledgement and appreciation was evidenced by, among other things, the Lewis Defendants' misappropriation and use of the funds for their own personal gain and benefit, in breach of their legal obligations to Plaintiff.

90.     It would be inequitable to allow the Lewis Defendants to retain this valuable benefit where the Lewis Defendants have failed to deliver unencumbered ownership and clear titles to the 25 cars that were purchased by Plaintiff for $488,100.

91.     The Lewis Defendants should be required to immediately disgorge and return to Plaintiff the $488,100 received from Plaintiff for the 25 cars, the $14,700 received from Plaintiff for the transportation costs, and all other monies received from Plaintiff, plus interest and the costs and fees associated with collecting this amount.

92.     The Lewis Defendants, in their individual capacities and, as discussed above, as alter egos of each other, are jointly and severally liable to Plaintiff for all damages suffered by Plaintiff under this claim.

## FIFTH CLAIM FOR RELIEF
### (Promissory Estoppel)
### Against the Lewis Defendants

93.     Plaintiff re-alleges and incorporates herein by reference each of the preceding allegations as if set forth completely herein.

94.     The Lewis Defendants were aware of all the important facts of the promises they made to Plaintiff regarding their sale of the 25 cars to Plaintiff.

95.     The Lewis Defendants, through their broker, who was acting as their agent or apparent agent, promised to Plaintiff that the Lewis Defendants would, upon receiving $488,100 from Plaintiff, pay off the balances of the 25 cars and transfer unencumbered ownership of the cars, including clear titles, to Plaintiff.

96.     The Lewis Defendants knew or should have expected that the above promises would lead Plaintiff to transfer the $488,100 to them, as well as to pay shipping expenses in the amount of $14,700 for the delivery of the cars.

97.     Also, as described above, Defendant Gary Lewis made multiple promises to Plaintiff that the Lewis Defendants would transfer the 25 car titles to Plaintiff.  For instance, he stated, "I will guarantee that you will have all titles by 12/2 at the latest due to Thanksgiving Holidays."  Defendant Gary Lewis knew or should have expected that this promise would lead Plaintiff to forgo immediately taking legal action against the Lewis Defendants.

98.     Plaintiff reasonably relied on the above promises made by the Lewis Defendants.

99.     Plaintiff suffered damages as a result of its actions and inactions that were induced by the Lewis Defendants' promises.  Plaintiff suffered damages in an amount to be determined at trial, but not less than $500,000, plus interest, attorney's fees and court costs.

100.     The Lewis Defendants, in their individual capacities and, as discussed above, as alter egos of each other, are jointly and severally liable to Plaintiff for all damages suffered by Plaintiff under this claim.

## SIXTH CLAIM FOR RELIEF
### (Conversion)
### Against All Defendants

101.     Plaintiff re-alleges and incorporates herein by reference each of the preceding allegations as if set forth completely herein.

102.     By means of their fraudulent scheme, the Lewis Defendants have willfully interfered with monies belonging to Plaintiff – including the $488,100 taken by the Lewis Defendants via wire, and the $14,700 taken by the Lewis Defendants' transportation company.

103.     The Lewis Defendants' willful interference was done without lawful justification.

104.     The Lewis Defendants have deprived Plaintiff of its use and possession of its monies, to which Plaintiff is and was entitled to immediate possession.

105.     As a result of the Lewis Defendants' unlawful conversion, Plaintiff suffered damages in an amount to be determined at trial, but not less than $500,000, plus interest, attorney's fees and court costs.

106.     The Lewis Defendants, in their individual capacities and, as discussed above, as alter egos of each other, are jointly and severally liable to Plaintiff for all damages suffered by Plaintiff under this claim.

107.    As described above, the Lewis Defendants, as franchisees under the direction and control of Defendant Dollar Thrifty, were acting as Defendant Dollar Thrifty's agent or apparent agent, including in the course of perpetrating this unlawful conversion against Plaintiff.  As such, Defendant Dollar Thrifty is jointly and severally liable to Plaintiff for all damages suffered by Plaintiff under this claim.

## SEVENTH CLAIM FOR RELIEF
### (Fraud)
### Against All Defendants

108.    Plaintiff re-alleges and incorporates herein by reference each of the preceding allegations as if set forth completely herein.

109.    In late July to middle August 2013, the Lewis Defendants, through their broker, who acted as their agent or apparent agent, represented to Plaintiff's sales manager that the Lewis Defendants would, upon receiving $488,100 from Plaintiff, pay off the balances of the 25 cars and transfer unencumbered ownership of the cars, including clear titles, to Plaintiff.  These representations were made to Plaintiff via telephone and email.

110.    These representations were important and material to Plaintiff's decision to purchase the cars, and Plaintiff would not have provided any funds to the Lewis Defendants absent such representations.

111.    The Lewis Defendants knew that the above representations made by their broker, who was acting as their agent or apparent agent, were false when made.  The Lewis Defendants never intended to pay off the balances with the lenders or to transfer the car titles to Plaintiff.  The Lewis Defendants had their broker make these false representations to Plaintiff for the

purpose of deceiving Plaintiff into transferring the $488,100 in funds to the Lewis Defendants so that they could use the funds for their own personal benefit and gain.

112.    Plaintiff reasonably relied upon the representations made by the Lewis Defendants through their broker, which representations were made with the intent that Plaintiff would so rely, and which representations were consistent with industry custom and practice; to wit, the buyer advances funds so that the seller can extinguish the existing liens and provide clean title to the buyer.

113.    Further, as described above, Defendant Gary Lewis made additional false statements to Plaintiff in furtherance of their fraudulent scheme, for the purpose of preventing or delaying Plaintiff from exercising its legal rights against the Lewis Defendants.  For instance, after Plaintiff's president stated that he had no choice but to pursue civil and criminal actions against the Lewis Defendants, Defendant Gary Lewis stated that "some [car titles] are currently in process"; however, in fact, the Lewis Defendants had made no progress in getting any of the car titles from the lenders, and they had no intention of doing so.  Defendant Gary Lewis also stated, "I will guarantee that you will have all titles by 12/2 at the latest due to Thanksgiving Holidays"; however, in fact, the Lewis Defendants had no intention of keeping this promise, which they made for the purpose of deceiving Plaintiff into foregoing its pursuit of civil and criminal legal actions against them.

114.    As a result of the Lewis Defendants' fraud and deception perpetrated on Plaintiff, Plaintiff has suffered damages in an amount to be determined at trial, but not less than $500,000, plus interest, court costs, attorney's fees, and punitive damages.

115.    The Lewis Defendants, in their individual capacities and, as discussed above, as alter egos of each other, are jointly and severally liable to Plaintiff for all damages suffered by Plaintiff under this claim.

116.    As described above, the Lewis Defendants, as franchisees under the direction and control of Defendant Dollar Thrifty, were acting as Defendant Dollar Thrifty's agent or apparent agent, including in the course of perpetrating this fraud and deception against Plaintiff.  As such, Defendant Dollar Thrifty is jointly and severally liable to Plaintiff for all damages suffered by Plaintiff under this claim.

**EIGHTH CLAIM FOR RELIEF**
**(Vicarious Liability)**
**Against Defendant Dollar Thrifty**

117.    Plaintiff re-alleges and incorporates herein by reference each of the preceding allegations as if set forth completely herein.

118.    As described above, the Lewis Defendants, as franchisees under the direction and control of Defendant Dollar Thrifty, were acting as Defendant Dollar Thrifty's agent or apparent agent, including in the course of perpetrating their fraudulent scheme and unlawful acts against Plaintiff.

119.    Further, upon information and belief, under its franchise agreement with the Lewis Defendants, Defendant Dollar Thrifty financially benefitted from the unlawful acts of the Lewis Defendants.

120.    Accordingly, Defendant Dollar Thrifty is jointly and severally liable to Plaintiff for all damages suffered by Plaintiff as a result of the tortious acts committed by Defendant Dollar Thrifty's agents and/or apparent agents, the Lewis Defendants.

### NINTH CLAIM FOR RELIEF
**(Civil RICO / RICO Conspiracy - § 1962(c) & (d))**
**Against the Lewis Defendants**

121.    Plaintiff re-alleges and incorporates herein by reference each of the preceding allegations as if set forth completely herein.

122.    Defendants Gary Lewis, Patrick Lewis, LTG, Lewis Ventures and Lewis Management are each a "person" under 18 U.S.C. § 1961(3), as each of them is an "entity capable of holding a legal or beneficial interest in property."

123.    The Lewis Defendants, together with other persons including their broker, their transportation company and its drivers, and their employees and members, constitute a group of persons associated in fact although not a legal entity and, therefore, constitute an "enterprise" under 28 U.S.C. § 1961(4).

124.    This enterprise existed and exists separate and apart from the persons who constitute the enterprise.  This enterprise existed and exists separate and apart from the pattern of racketeering activity, and is a separate and distinct "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

125.    Among the goals and purposes of the enterprise were to illegally obtain the monies of Plaintiff and other victims for the use and benefit of the enterprise.

126.    The members of the enterprise agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff.  Specifically:

        a)    The Lewis Defendants, through their broker, who was acting as their agent or apparent agent, falsely represented to Plaintiff's sales manager that the Lewis

Defendants would transfer unencumbered ownership of the 25 cars, including titles, upon

receipt of $488,100 from Plaintiff.  The Lewis Defendants had their broker make these

false representations to Plaintiff's sales manager to fraudulently induce Plaintiff to

purchase the cars from them even though the Lewis Defendants never intended to deliver

the promised titles.  The communications between the Lewis Defendants' broker and

Plaintiff's sales manager, which took place between late July and middle August 2013,

occurred over interstate telephone wires.  In these communications, the broker

represented to Plaintiff that the cars were for sale by Thrifty.

      b)      The Lewis Defendants fraudulently induced Plaintiff to transfer a total of

$488,100 to them via three separate interstate wire transfers from Plaintiff's bank account

to LTG's bank account.  The details of these three wire transfers are recited above, and

details of the wire transfers are attached as Exhibits hereto.

              i.The first fraudulently-induced wire transfer was made to the Lewis

                  Defendants on August 15, 2013.

             ii.The second fraudulently-induced wire transfer was made to the Lewis

                  Defendants on August 16, 2013.

            iii.The third fraudulently-induced wire transfer was made to the Lewis

                  Defendants on August 21, 2013.

      c)      To perpetrate their scheme, the Lewis Defendants emailed to Plaintiff

three separate "Bill of Sale Agreements" via interstate telephone wires.  Each of these

agreements was signed by Defendant Patrick Lewis on behalf of LTG, and contained

instructions for the transfer of fraudulently obtained funds to LTG's bank account via

interstate wires.  The agreements reference "Thrifty Car Rental" multiple times.   Copies

of these agreements are attached as Exhibits hereto.

        i.The first Bill of Sale Agreement emailed by the Lewis Defendants is dated

            August 14, 2013.

        ii.The second Bill of Sale Agreement emailed by the Lewis Defendants is

            dated August 21, 2013.

        iii.The third Bill of Sale Agreement emailed by the Lewis Defendants is

            dated August 21, 2013.

      d)      After Plaintiff had wired $488,100 in total funds to LTG, in furtherance of

their fraudulent scheme, the Lewis Defendants made multiple false representations to

Plaintiff concerning the status of the car titles.  Contrary to the Lewis Defendants'

representations that the titles would be delivered shortly, the Lewis Defendants in fact

had no intention of delivering the titles and were simply deceiving Plaintiff into

foregoing its initiation of civil and criminal legal action against them.  As described

above, these false representations were first made by the Lewis Defendants to Plaintiff's

sales manager and general manager, using interstate telephone wires, in and around late

September 2013.  Later, starting in October 2013, the Lewis Defendants' false

representations were made to Plaintiff's president, also using interstate telephone wires.

The details and content of the interstate text and email communications between

Defendant Gary Lewis and Plaintiff's president are recited above.  Defendant Patrick

Lewis also used interstate text communications to further Defendants' fraudulent scheme.

e)      Also, the Lewis Defendants, through their transportation company, used the interstate roadways to transport the 25 cars for which they fraudulently induced Plaintiff to transfer $488,100 in funds to the Lewis Defendants, and to pay COD in the amount of $14,700 to the Lewis Defendants' transportation company.

127.    As described above, pursuant to and in furtherance of their fraudulent scheme, the Lewis Defendants committed multiple related acts of wire fraud in violation of 18 U.S.C. § 1343. Specifically, the Lewis Defendants had a scheme to defraud Plaintiff; the Lewis Defendants had knowledge of, and intentionally participated in, this fraudulent scheme; and the Lewis Defendants used interstate wires to further their fraudulent scheme.

128.    The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

129.    The racketeering acts set forth above occurred within ten years of each other and pose a continuing threat if not abated.

130.    Upon information and belief, the Lewis Defendants have targeted other victims with their fraudulent scheme and racketeering activities.  As stated, the FBI is currently investigating one or more of the Lewis Defendants for potential violations of federal law, including their unlawful conduct against Plaintiff and other potential victims, and, on information and belief, Defendant Gary Lewis has admitted his fraudulent acts against Plaintiff in connection with that investigation.

131.    The Lewis Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

132.     In conducting and participating in this RICO violation, the Lewis Defendants agreed and conspired to participate in the operation and management of a RICO enterprise, including agreeing that they would commit or cause to be committed the predicate acts described above.  Therefore, the Lewis Defendants committed a conspiracy to violate RICO, a separate violation of 18 U.S.C. § 1962(d).

133.     As a direct and proximate result of the Lewis Defendants' racketeering activity and violations of 18 U.S.C. § 1962(c) and (d), Plaintiff has been injured in its business and property.  Among other things, Plaintiff was fraudulently induced to transfer $488,100 in funds to the Lewis Defendants, has been forced to expend its own additional funds to obtain titles to 21 of the 25 cars that it purchased from the Lewis Defendants, and has no title whatsoever for the remaining cars it purchased from the Lewis Defendants.  Plaintiff has also been forced to expend substantial time and money attempting to get the car titles from the Lewis Defendants, maintaining the 25 cars that it could not sell to customers due to lack of title, dealing with the lenders of the 25 cars (some of whom were demanding payment from Plaintiff for the balances), and taking legal action against the Lewis Defendants to compel them to pay off the lenders and transfer the car titles.  Plaintiff also paid the Lewis Defendants for the delivery costs of the 25 cars, which were useless to Plaintiff without the titles because Plaintiff could not sell them to customers.  The injuries to Plaintiff from the Lewis Defendants' pattern of racketeering activities are ongoing to this date.

134.     As a result of the Lewis Defendants' RICO violation, Plaintiff has suffered damages in an amount to be determined at trial, but not less than $500,000, trebled under RICO, plus court costs and attorney's fees.

34

135.    The Lewis Defendants, in their individual capacities and, as discussed above, as alter egos of each other, are jointly and severally liable to Plaintiff for all damages suffered by Plaintiff under this claim.

## TENTH CLAIM FOR RELIEF
### (Preliminary Injunctive Relief / Interpleader)
### Against All Defendants

136.    Plaintiff re-alleges and incorporates herein by reference each of the preceding allegations as if set forth completely herein.

137.    Upon information and belief, Defendant Dollar Thrifty and the Lewis Defendants have entered into a contract whereby Dollar Thrifty has agreed to purchase back the Lewis Defendants' Thrifty franchise.

138.    As set forth in the claims above, Plaintiff is entitled to those monies as a source of recovery for the damages caused by Defendants' conduct.

139.    Plaintiff has a substantial likelihood of prevailing on the merits of this case.

140.    If those monies are transferred to the Lewis Defendants, there is probable cause to believe that the Lewis Defendants will take actions to prevent or hinder Plaintiff from using those monies as a source of recovery for its losses.  This creates a threat of irreparable harm and may leave Plaintiff without an adequate remedy at law.

141.    Thus, any monies that Defendant Dollar Thrifty has agreed to pay the Lewis Defendants should not be transferred to the Lewis Defendants.  Instead, Defendant Dollar Thrifty should be required to hold and set aside those monies until Plaintiff and the Lewis Defendants have litigated their rights to those funds.  Alternatively, Defendant Dollar Thrifty should be

required to interplead these funds with the Court until Plaintiff's claim to those funds has been litigated or resolved.

142.    The public interest favors the grant of such injunctive relief.

143.    Wherefore, Plaintiff requests that the Court enter a preliminary injunctive order requiring Defendant Dollar Thrifty to withhold transferring any monies to the Lewis Defendants until Plaintiff and the Lewis Defendants have litigated their rights to those funds, or requiring Defendant Dollar Thrifty to interplead these funds with the Court.

**ELEVENTH CLAIM FOR RELIEF**
**(Pre-Judgment Writ of Attachment)**
**Against All Defendants**

144.    Plaintiff re-alleges and incorporates herein by reference each of the preceding allegations as if set forth completely herein.

145.    Plaintiff has a substantial likelihood of prevailing on the merits of this case.

146.    Upon information and belief, there is probable cause to believe that the Lewis Defendants have taken, and continue to take, actions in an attempt to defraud their creditors.  As a result of these actions, Plaintiff may lose its remedy against the Lewis Defendants.

147.    Further, the Lewis Defendants fraudulently incurred the obligations that are the subject of this action.

148.    All other requirements for the issuance of a prejudgment writ of attachment against the Lewis Defendants are met in this case.

149.    Wherefore, Plaintiff requests that the Court enter a prejudgment writ of attachment against the Lewis Defendants.

150.    For the reasons set forth above, any monies that Defendant Dollar Thrifty has agreed to pay the Lewis Defendants should be subject to this prejudgment writ of attachment, and should be deposited into a fund with the Court until Plaintiff's claims to those funds has been litigated or resolved in full.

## **PRAYER FOR RELIEF**

A.    Pursuant to Plaintiff's First Claim for Relief, judgment against the Lewis Defendants, jointly and severally, for damages according to proof at trial, but not less than $500,000; for pre- and post-judgment interest according to law; for Plaintiff's attorneys' fees and costs of this action; for a prejudgment writ of attachment, and any and all other necessary and appropriate prejudgment relief; and for such other and further relief as the Court deems just and proper.

B.    Pursuant to Plaintiff's Second Claim for Relief, judgment against the Lewis Defendants, jointly and severally, for damages according to proof at trial, but not less than $500,000; for pre- and post-judgment interest according to law; for Plaintiff's attorneys' fees and costs of this action; for a prejudgment writ of attachment, and any and all other necessary and appropriate prejudgment relief; and for such other and further relief as the Court deems just and proper.

C.    Pursuant to Plaintiff's Third Claim for Relief, judgment against the Lewis Defendants, jointly and severally, for damages according to proof at trial, but not less than $500,000; for pre- and post-judgment interest according to law; for Plaintiff's attorneys' fees and costs of this action; for a prejudgment writ of attachment, and any and all other necessary and

appropriate prejudgment relief; and for such other and further relief as the Court deems just and proper.

       D.     Pursuant to Plaintiff's Fourth Claim for Relief, an Order requiring the Lewis Defendants to immediately disgorge and return to Plaintiff the $488,100 in funds they received from Plaintiff for the 25 cars, the $14,700 in funds they received from Plaintiff for transportation costs, and for all other monies they received from Plaintiff; for pre- and post-judgment interest according to law; for Plaintiff's attorneys' fees and costs of this action; for a prejudgment writ of attachment, and any and all other necessary and appropriate prejudgment relief; and for such other and further relief as the Court deems just and proper.

       E.     Pursuant to Plaintiff's Fifth Claim for Relief, judgment against the Lewis Defendants, jointly and severally, for damages according to proof at trial, but not less than $500,000; for pre- and post-judgment interest according to law; for Plaintiff's attorneys' fees and costs of this action; for a prejudgment writ of attachment, and any and all other necessary and appropriate prejudgment relief; and for such other and further relief as the Court deems just and proper.

       F.     Pursuant to Plaintiff's Sixth Claim for Relief, judgment against all Defendants, jointly and severally, for damages according to proof at trial, but not less than $500,000; for punitive damages; for pre- and post-judgment interest according to law; for Plaintiff's attorneys' fees and costs of this action; for a prejudgment writ of attachment, and any and all other necessary and appropriate prejudgment relief; and for such other and further relief as the Court deems just and proper.

G.      Pursuant to Plaintiff's Seventh Claim for Relief, judgment against all Defendants, jointly and severally, for damages according to proof at trial, but not less than $500,000; for punitive damages; for pre- and post-judgment interest according to law; for Plaintiff's attorneys' fees and costs of this action; for a prejudgment writ of attachment, and any and all other necessary and appropriate prejudgment relief; and for such other and further relief as the Court deems just and proper.

H.      Pursuant to Plaintiff's Eighth Claim for Relief, judgment against Defendant Dollar Thrifty, jointly and severally, for all damages caused by the torts of its agent and/or apparent agent, the Lewis Defendants.

I.      Pursuant to Plaintiff's Ninth Claim for Relief, judgment against the Lewis Defendants, jointly and severally, for damages according to proof at trial, but not less than $500,000; for treble damages; for pre- and post-judgment interest according to law; for Plaintiff's attorneys' fees and costs of this action; for a prejudgment writ of attachment, and any and all other necessary and appropriate prejudgment relief; and for such other and further relief as the Court deems just and proper.

J.      Pursuant to Plaintiff's Tenth Claim for Relief, a preliminary injunctive order requiring Defendant Dollar Thrifty to withhold transferring any monies it has agreed to pay the Lewis Defendants, and to hold and set aside those monies until Plaintiff and the Lewis Defendants have litigated their rights to those monies.

K.      Pursuant to Plaintiff's Eleventh Claim for Relief, a prejudgment writ of attachment sufficient to protect Plaintiff's ability to recover its losses.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands

trial by jury on all issues so triable.

DATED this 2nd day of December, 2014.

MANNING CURTIS BRADSHAW
 & BEDNAR LLC

/s/ Sammi V. Anderson

_____
Sammi V. Anderson
James E. Ji
*Attorneys for Plaintiff Nationwide Car Sales, Ltd.*

## **VERIFICATION**

STATE OF PENNSYLVANIA          )
                               : ss
COUNTY OF LUZERNE              )

Joseph Prociak, President of Hud Contractors, Inc., the General Partner of Nationwide

Car Sales, Ltd and CEO of Nationwide Car Sales, Ltd., who being first duly sworn on oath,

states that he has read the foregoing Verified Complaint; that he knows and understands the

allegations and statements contained therein; and that, based on the information known to him

and provided to him by other employees of Nationwide Car Sales, Ltd., the same are true and

accurate to the best of his knowledge, except as to those matters stated herein on information and

belief and as to those matters he believes them to be true.

_____
Joseph Prociak
President of Hud Contractors, Inc., the General Partner of
Nationwide Car Sales, Ltd and CEO of
Nationwide Car Sales, Ltd.

SUBSCRIBED AND SWORN to before me this 25th day of November, 2014.

_____
Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
SUSAN L BROCCA
Notary Public
NANTICOKE CITY, LUZERNE COUNTY
My Commission Expires Sep 20, 2017

{00868081.DOCX /}